**Nos. 12-15572, 12-15848**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| REPUBLIC OF ECUADOR; DR. DIEGO GARCÍA CARRIÓN, <br>            Plaintiffs-Appellees <br><br> v. <br><br> DR. DOUGLAS M. MACKAY, <br>            Defendant-Appellant <br><br> CHEVRON CORPORATION, <br>            Intervenor-Appellant | On Appeal from the United States District Court for the Eastern District of California, No. 12-mc-00008 <br><br><br> (Honorable L. O'Neill) |
| **Consolidated with** | |
| REPUBLIC OF ECUADOR; DR. DIEGO GARCÍA CARRIÓN, <br>            Plaintiffs-Appellees <br><br> v. <br><br> DR. MICHAEL A. KELSH, <br>            Defendant- Appellant <br><br> CHEVRON CORPORATION, <br>            Intervenor-Appellant | On Appeal from the United States District Court for the Northern District of California, No. 11-mc-80171 <br><br><br> (Honorable C. Breyer) |

### APPELLEES' BRIEF

Gene C. Schaerr
Eric W. Bloom
**Winston & Strawn LLP**
1700 K Street, NW
Washington, DC 20006
Tel. 202.282.5000

Richard A. Lapping
**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111
Tel. 415.591.1000

Counsel for Plaintiffs-Appellees,
Republic of Ecuador and Dr. Diego García Carrión

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................. 1

COUNTER-STATEMENT OF ISSUES ................................................ 2

COUNTER-STATEMENT OF FACTS ................................................ 3

    A.    Chevron's Oil Operations In Ecuador Cause Ecuadorian Citizens To Commence A Class Action In New York And Thereafter In *Lago Agrio*, Ecuador ............................................... 3

    B.    The Republic Signs A Limited Settlement And Release Agreement ....................................................................................... 7

    C.    After Failing In Its Efforts To Pursue AAA Arbitration, Chevron Initiates Arbitration Under The Ecuador-U.S. Treaty ............................................................................................ 8

    D.    The *Lago Agrio* Court Issues A Multi-Billion Dollar Judgment Against Chevron ........................................................ 11

    E.    Kelsh's And Mackay's Involvement In Ecuador For Chevron And The Importance Of The Discovery Sought By The Republic To The Treaty Arbitration ................................... 13

    F.    Kelsh, Mackay, And Chevron Are Withholding Documents Based On Mistaken Claims Of Work Product Protection .......... 17

    G.    The Courts Below Agree That Chevron's Assertions Of Work Product Protection Are Overbroad ................................... 19

SUMMARY OF ARGUMENT ......................................................... 21

STANDARD OF REVIEW .............................................................. 24

ARGUMENT ................................................................................... 25

i

I.     Chevron's Argument That The District Court Violated The "Plain Meaning" Of Rule 26 In Denying Work Product Protection To Documents Located In Expert Witness Files Is Patently Incorrect.......25

     A.     Chevron's Sweeping Interpretation Of Rule 26(B)(3)'s "By Or For" Language Would Violate Settled Principles Of Statutory Construction While Contravening The Advisory Committee's Understanding Of Its Own Amendments And The Rule's History ...................................................26

          1.     Chevron's Interpretation Violates The "Meaning To Every Clause" And "Espressio Unius" Principles............27

          2.     Chevron's Interpretation Cannot Be Reconciled With The Advisory Committee's Stated Intention To Preserve Broad Discovery Of Expert-Related Materials Other Than Draft Reports And Direct Attorney-Expert Communications...................................30

          3.     Chevron's Interpretation Cannot Be Reconciled With The Long History Of Rules 26 And Its Interpretation By The Courts....................................................................33

     B.     Properly Understood, The *General* Rule Under Rule 26(b)(3) That Materials Prepared "By Or For" A Party Are Protected Work Product Does Not Extend To Documents Prepared By Or Provided To Third Parties, Like The Testifying Experts Here, Who Are Not Agents Of The Party Or The Attorney ........................................................38

          1.     A Document Can Only Be Deemed To Have Been Created "For" An Attorney Or A Party If It Was Created By Their Agent....................................................38

          2.     Draft Reports Aside, The Work Product Doctrine Does Not Protect Documents Created *By* Testifying Expert Witnesses Because They Are Not Agents Of An Attorney ....................................................................41

          3.     Attorney Communications Aside, Any Work Product Protection Is Waived When Documents Are Disclosed To Testifying Expert Witnesses.........................................44

4.    Contrary To Chevron's Argument, The Change In Rule 26(a) To Require Disclosure Of "Facts And Data" Simply Made That Provision, Which Deals With Initial Disclosures, Consistent With The Scope Of Third-Party Discovery Under Rule 26(b)....................45

C.    The Decisions Below Properly Applied These Principles In Rejecting Chevron's Work Product Claims As To All Three Categories Of Documents As To Which The Republic's Motions Were Granted ...............................................................48

1.    Communications Between Non-Attorney Chevron Employees And Testifying Experts Or Their Assistants ...........................................................48

2.    Communications Involving Non-Attorneys Claimed To Be "Agents" Of Chevron..............................................49

3.    Communications Solely Among Testifying Experts........50

II.    If Necessary, The District Court's Decisions Can And Should Be Affirmed On Alternative Grounds .......................................52

A.    Chevron's Position In This Case Is Flatly Contrary To Its Position In Other Cases, And Is Therefore Barred By Judicial Estoppel ............................................................52

B.    In Any Event, The Republic Has Made A Showing Of "Substantial Need" And Hardship Sufficient To Overcome Any Work product Protection That Might Exist Here................58

CONCLUSION ............................................................................60

STATEMENT OF RELATED CASES .............................................61

CERTIFICATE OF COMPLIANCE................................................62

CERTIFICATE OF FILING AND SERVICE ....................................63

# TABLE OF AUTHORITIES

Page

**CASES**

*Admiral Ins. Co. v. U.S. Dist. Court,*
881 F.2d 1486 (9th Cir. 1989) ...................................................................26, 58

*Aguinda v. Texaco, Inc.,*
303 F.3d 470 (2d Cir. 2002) ............................................................................4, 5

*Arizona v. Shamrock Foods Co.,*
729 F.2d 1208 (9th Cir. 1984) ...........................................................................53

*Babcock v. Jackson,*
40 Misc. 2d 757 (N.Y. Sup. Ct. 1963)................................................................39

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular,*
237 F.R.D. 618 (N.D. Cal. 2006).........................................................................45

*Bogosian v. Gulf Oil Corp.,*
738 F.2d 587 (3rd Cir. 1984) .............................................................................35

*Braxton v. United States,*
500 U. S. 344 (1991)...........................................................................................39

*Capsopoulos ex rel. Capsopoulos v. Chater,*
No. 95 C 3274, 1996 WL 717456 (N.D. Ill. Dec. 9, 1996)...............................57

*Chevron Corp. v. Barnthouse,*
No. 1:10-mc-00053 (S.D. Ohio) .........................................................................33

*Chevron Corp. v. Weinberg Group,*
No. 11-mc-00030 (D.D.C.)..................................................................................33

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th. Cir. 1995) .......................................................................23, 42

*Ecuadorian Plaintiffs v. Chevron Corp.,*
619 F.3d 373 (5th Cir. 2010) ..............................................................................45

*Fialkowski v. Perry,*
No. 11-5139, 2012 WL 2527020 (E.D. Pa. June 29, 2012) ........................47, 49

*Goodman v. Staples The Office Superstore, LLC*,
    644 F.3d 817 (9th Cir. 2011) ...............................................................25

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007) .....................................................47

*Helfand v. Gerson*,
    105 F.3d 530 (9th Cir. 1997) ...............................................53, 55, 57

*Hickman v. Taylor*,
    329 U.S. 495 (1947)...............................................................26, 33

*Ibrahim v. Dept. of Homeland Sec.*,
    669 F.3d 983 (9th Cir. 2012) ...............................................................25

*In re Chevron Corp.* (U.B.R.),
    633 F.3d 153 (3d Cir. 2011) ...............................................41, 44, 45

*In re CPUC*,
    892 F.2d 778 (9th Cir. 1989) ...............................................................41

*In re Pioneer Hi-Bred Int'l, Inc.*,
    238 F.3d 1370 (Fed. Cir. 2001) ...............................................36, 44

*Intermedics, Inc. v. Ventritex, Inc.*,
    139 F.R.D. 384 (N.D. Cal. 1991).......................................................35

*Jota v. Texaco, Inc.*,
    157 F.3d 153 (2d Cir. 1998) ...............................................................4

*Kemeny v. Skorch*,
    22 Ill. App. 2d 160 (Ill. Ct. App. 1959).............................................39

*Kirk v. Raymark Indus., Inc.*,
    61 F.3d 147 (3d Cir. 1995) ...............................................22, 43

*Maitland v. Univ. of Minn.*,
    43 F.3d 357 (8th Cir. 1994) ...............................................................57

*Matter of Town of Hempstead*,
    50 Misc.2d 101 (N.Y. Sup. Ct. 1966)................................................40

*Monier v. Chamberlain*,
   35 Ill. 2d 351 (Ill. 1966)......................................................................39

*Morissette v. United States*,
   342 U. S. 246 (1952).........................................................................39

*Nat'l R.R. Passenger Corp. v. Nat'l Assn. of R.R. Passengers*,
   414 U.S. 453 (1974)..........................................................................29

*Nevada Dept. of Corrs. v. Greene*,
   648 F.3d 1014 (9th Cir. 2011) ...........................................................25

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)..........................................................................53

*NLRB v. Amax Coal Co.*,
   453 U. S. 322 (1981).........................................................................39

*Penn Nat'l Ins. Co. v. HNI Corp.*,
   245 F.R.D. 190 (M.D. Pa. 2007) .......................................................51

*Quinn v. Anvil Corp.*,
   620 F.3d 1005 (9th Cir. 2010) ...........................................................25

*R & R Sails, Inc. v. Ins. Co. of Pennsylvania*,
   673 F.3d 1240 (9th Cir. 2012) ...........................................................25

*Rambus Inc. v. Hynix Semiconductor Inc.*,
   254 F.R.D. 597 (N.D.Cal. 2008).......................................................47

*Reg'l Airport Auth. of Louisville v. LFG, LLC*,
   460 F.3d 697 (6th Cir. 2006) .............................................................36

*Republic of Ecuador v. Bjorkman*,
   11-cv-01470-WYD-MEH, 2012 WL 12755 (D. Colo. Jan. 4, 2012)...........32, 33

*Republic of Ecuador v. Chevron Corp.*,
   638 F.3d 384 (2d Cir. 2011) ...........................................................3, 5

*Republic of Ecuador v. ChevronTexaco Corp.*,
   376 F. Supp. 2d 334 (S.D.N.Y. 2005) ...........................................4, 5, 7

*Republic of Ecuador v. ChevronTexaco Corp.*,
    499 F. Supp. 2d (S.D.N.Y. 2007) ............................................................4, 9, 10

*Risetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 497 (9th Cir. 1996) ..................................................................53

*Ruiz v. Comm'r of Dept. of Transp. of City of New York*,
    858 F.2d 898 (2d Cir. 1988) .................................................................58

*Sachs v. Aluminum Co. of Am.*,
    167 F.2d 570 (6th Cir. 1948) ...........................................................34, 36

*Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*,
    No. 05 Civ. 3939 (CM), 2008 WL 4127830 (S.D.N.Y. Sept. 2, 2008).............57

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978).........................................................................29

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)..........................................................................29

*TV-3 v. Royal Ins. Co. of Am.*,
    194 F.R.D. 585 (S.D. Miss. 2000) ........................................................52

*United States v. Palacios*,
    677 F.3d 234 (4th Cir. 2012) ..............................................................47

*United States v. McKay*,
    372 F.2d 174 (5th Cir. 1967) ..........................................................34, 35

*United States v. Meyer*,
    398 F.2d 66 (9th Cir. 1968) .....................................................34, 44, 52, 60

*United States v. Nobles*,
    422 U.S. 225 (1975).................................................................26, 35, 36, 41

*Wagner v. Professional Engineers in California Gov't*,
    354 F.3d 1036 (9th Cir. 2004) ............................................................53

## STATUTES

28 U.S.C. § 1782 ...............................................................................passim

New York C.P.L.R. 3101(d)(1) ................................................................40

## OTHER AUTHORITIES

Black's Law Dictionary 628 (8th ed. 2007) .........................................46

C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure* § 2029 (2010) ....................................................................................34, 40, 47

Fed. R. Civ. P. 26(a)(2)(B) ....................................................32, 37, 47

Fed. R. Civ. P. 26(a)(2)(C) ................................................................50

Fed. R. Civ. P. 26(b)(3)(A) ..................................................25, 30, 41, 49

Fed. R. Civ. P. 26(b)(4)(A) ........................................................37, 44

Fed. R. Civ. P. 26(b)(4)(B)-(C)........................................................passim

Fed. R. Evid. 702 .............................................................................23, 42

## INTRODUCTION

Appellees Dr. Michael A. Kelsh, Dr. Douglas M. Mackay, and Chevron Corp. (collectively, "Chevron") seek to undermine the Republic of Ecuador and Dr. Diego García Carrión's (collectively, "the Republic") efforts to obtain discovery by way of 28 U.S.C. § 1782 in aid of a multi-billion dollar arbitration (the "Treaty Arbitration") brought by Chevron against the Republic.   Yet Chevron's efforts were unavailing in the courts below, where Chevron argued that a recent amendment of Rule 26 to exclude two discrete categories of expert-related documents—draft reports and attorney-expert communications—had the effect of extending the federal work product doctrine to areas where it has never before applied.   Despite the decisions of the courts below, Chevron persists in withholding thousands of documents based on a strained interpretation that Rule 26 protects communications between testifying experts and non-attorneys, or among testifying experts, even though the communications were considered by the experts in preparing their respective expert reports.   Chevron even expands the work product protection to protect documents in the expert's own files, thereby affording experts their own independent work product protection.

Chevron's overbroad interpretation of Rule 26 has no merit.   As the 2010 amendments make clear, and as the courts below have agreed, work product protection concerning reporting experts afforded by Federal Rule of Civil

1

Procedure 26 is limited to *only* two classes of documents:  (i) the expert's draft reports and (ii) certain communications between the expert and counsel.  That, moreover, has been Chevron's own position in a series of Section 1782 proceedings in which it has successfully sought discovery of expert-related materials for its *own* use in the same Treaty Arbitration.  Chevron was right then, and it is wrong now.

## COUNTER-STATEMENT OF ISSUES

I.     Whether the courts below abused their discretion in refusing to allow Chevron to assert work product protection over documents in the files of its testifying experts, Kelsh and Mackay, other than documents that are specifically protected from disclosure by amended Rules 26 (b)(4)(B) and (b)(4)(C)?

II.    If so, whether Kelsh, Mackay, and Chevron are nevertheless judicially estopped from asserting work product protection over the discovery sought by the Republic where Chevron has itself successfully sought and obtained Section 1782 discovery (in connection with the same arbitration and from experts acting in equivalent roles) of documents that other parties withheld on the same grounds that Chevron now espouses in these appeals?

III.   If the Court concludes that Chevron has appropriately asserted work product protection for the expert-related documents at issue here, whether the

2

Republic has nevertheless demonstrated substantial need for the documents at issue?

## COUNTER-STATEMENT OF FACTS[1]

Chevron retained Appellants Kelsh and Mackay as experts to defend against liability for its oil extraction operations in Ecuador.  Kelsh was primarily retained to opine on the health effects, including cancer, of Chevron's twenty-plus year operation in Ecuador; Mackay was retained to offer his opinions on the propriety of Chevron's soil and water testing during the trial as well as on the expert opinions of Chevron's adversaries.   The following facts provide general background on this long-running dispute and offer context to explain the relevance and importance of the discovery sought in this proceeding.

### A. Chevron's Oil Operations In Ecuador Cause Ecuadorian Citizens To Commence A Class Action In New York And Thereafter In *Lago Agrio*, Ecuador

Chevron merged with Texaco, Inc. in 2001.[2]  From 1964 through June 1992, Texaco's subsidiary, known as "TexPet," was a partial equity participant (50 percent and later 37.5 percent) in an oil exploration and development concession

---

[1]     In citing the record, this brief will use the following abbreviations:  "ER___" for Excerpts of the Record filed by Chevron; and "SER___" for Supplemental Excerpts of the Record filed by the Republic.

[2]     *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.1 (2d Cir. 2011).

(the "Concession") in the Eastern section of Ecuador's Amazonian rain forest. TexPet served as the Concession's sole operator, or manager, for twenty-five years, from 1965 to 1990. *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 338-41 (S.D.N.Y. 2005) ("*ROE I*").

One year after TexPet's interest in the Concession expired, a group of indigenous residents of the *Oriente* region filed a class action complaint against Texaco in the U.S. District Court for the Southern District of New York (the "*Aguinda*" action). The *Aguinda* plaintiffs alleged that TexPet had polluted private and public lands and streams in Ecuador. They demanded both monetary damages and extensive equitable relief to reimburse them for oil-related health problems and "to compel the cleanup of their community's environmental resources." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473-74 (2d Cir. 2002) ("*Aguinda II*"); *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 456 (S.D.N.Y. 2007) ("*ROE II*").

Texaco moved to dismiss the *Aguinda* action on, among other grounds, *forum non conveniens* principles, arguing that the case should be tried in the Ecuadorian courts. *Jota v. Texaco, Inc.*, 157 F.3d 153, 156 (2d Cir. 1998). In support, Texaco submitted a dozen affidavits from Ecuadorian law experts praising the Ecuadorian court system and process.

After two trips to the Second Circuit, and after Texaco promised to submit to jurisdiction in Ecuador and to satisfy any final judgment against it, the case was dismissed on *forum non conveniens* grounds. *Aguinda I*, 142 F. Supp. 2d at 537; *Aguinda II*, 303 F.3d at 473.

Following the *forum non conveniens* dismissal of the *Aguinda* action in New York, most of the *Aguinda* plaintiffs re-filed their claims in *Lago Agrio*, Ecuador against Chevron, which had by then merged with Texaco and bound itself to Texaco's commitments.[3] *ROE I*, 376 F. Supp. 2d at 341-42. As in *Aguinda*, the Plaintiffs alleged that (a) TexPet, as manager, caused contamination and harmed the people residing in the region, and that (b) the methods and technology that TexPet had employed had already been prohibited in other countries "due to their lethal effects on the environment and human health."[4] The Plaintiffs further alleged that TexPet's "willful misconduct" and "negligence" caused severe contamination of the land and waters in the region, affecting not only the drinking water and crops, but also the livelihood, culture and general health of the

---

[3]    *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.3 (2d Cir. 2011) (stating that "Chevron Corporation . . . remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action").

[4]    SER 6, 14-15, Complaint in *Maria Aguinda y Otros v. ChevronTexaco Corp.*, No. 002-2003-P-CSJNL, Superior Court of Nueva Loja (May 7, 2003) §§ I(5), I(7), IV(5)-(6).

population, which allegedly saw a rise in cancer, birth defects, and other illnesses.[5] As in *Aguinda*, the Plaintiffs demanded that: (i) medical monitoring and care be established for the affected residents; (ii) the polluting elements still in the region be removed; and (iii) remediation be performed on both private and public lands to repair the environmental damage.[6]

The *Lago Agrio* action proceeded in Ecuador with dozens of judicial site inspections, thousands of test samples, and voluminous reports by both party and court-appointed experts investigating and analyzing the extent and causes of pollution, health risks, and other harm to the land and inhabitants of the Concession area.[7] As is specifically relevant here, Chevron relied on Dr. Mackay to support its argument in the Treaty Arbitration that the scientific evidence in the *Lago Agrio* Court's trial record so strongly supports Chevron's defenses that the court's decision (currently under review by an Ecuadorian appellate court) could only have resulted from fraud, procedural irregularity or judicial corruption. For his part, Dr. Kelsh served as an expert for Chevron and offered extensive opinions

---

[5] *Id.* at SER 6, 11-13, 16, §§ I(7), III(1)-(5), IV(9).

[6] *Id.* at SER 13-16, § VI.

[7] *See* SER 43, Aff. of Andrew Woods (Mar. 3, 2010), ¶ 8, *filed in Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-JLK-MEH (D. Colo.) (stating that the *Lago Agrio* record is 200,000 pages).

challenging the Plaintiffs' claims of excess cancer deaths, other health problems, and the need for additional health care infrastructure.

### B.   The Republic Signs A Limited Settlement And Release Agreement

While the *Aguinda* action was pending, the Republic, its state-owned oil company, PetroEcuador, and TexPet entered into a series of Settlement and Release Agreements wrapping up TexPet's oilfield remediation obligations *vis-à-vis* the Government of Ecuador.   Under these agreements, TexPet agreed to perform specified remedial work in exchange for a release by the Government and PetroEcuador of all of their claims against TexPet and Texaco.   *ROE I*, 376 F. Supp. 2d at 341-42.   Because the *Aguinda* case was then pending in New York, these agreements by their terms "applied *without prejudice to the rights possibly held by third parties*"—particularly the *Aguinda* plaintiffs—"for the impact caused as a consequence of the operations of the former PetroEcuador-Texaco Consortium."[8]

---

[8]     SER 49, Memorandum of Understanding between the Government of Ecuador, PetroEcuador, and Texaco Petroleum Company (Dec. 14, 1994) art. VIII (emphasis added).

7

Notwithstanding that limitation, Chevron has argued in the *Lago Agrio* litigation, unsuccessfully, that the Republic's release not only prohibited future claims by the Republic.[9]

### C.    After Failing In Its Efforts To Pursue AAA Arbitration, Chevron Initiates Arbitration Under The Ecuador-U.S. Treaty

Although it could have done so, and indeed it advised the Second Circuit that it would do so upon a *forum non conveniens* dismissal,[10] Chevron made no effort to implead the Republic into the *Lago Agrio* action or otherwise file an independent action against the Republic in the Ecuadorian courts that Chevron had previously praised.  Instead, in June 2004, Chevron commenced a separate AAA arbitration in the U.S. District Court for the Southern District of New York seeking a declaration that PetroEcuador, the Republic's oil company, was contractually obligated to indemnify Chevron for all defense costs and liability that Chevron had incurred and would incur in defending the *Lago Agrio* action.[11]  PetroEcuador and the Republic successfully moved to stay the AAA arbitration on the ground that

---

[9]    Under the Ecuadorian Constitution, the Republic did not have the authority to waive the rights of its citizens to pursue their own third-party claims for damages allegedly caused by Chevron.  SER 62, Excerpt from Foreign Law Declaration of Genaro Eguiguren and Ernesto Albán (Dec. 20, 2006) ¶ 113.

[10]    *See* SER 74, Excerpts from Br. for Def. Appellee (Dec. 20, 2001), filed in *Aguinda v. Texaco, Inc.,* No. 01-7756(L). (2d Cir. Feb. 10, 2010).

[11]    *See* SER 104, ChevronTexaco Corp. and Texaco Petroleum Co.'s Demand for Arbitration (June 11, 2004).

neither the Republic nor PetroEcuador was bound by an agreement that neither had ever signed. *ROE II*, 499 F. Supp. 2d at 469, *aff'd* 296 F. App'x 124 (2d Cir. 2008), *cert. denied*, __ U.S. __, 129 S. Ct. 2862 (2009).

In the action, Chevron argued (as it had in *Lago Agrio*) that Texaco's settlement agreement with the Republic prohibited all third-party actions against it. The district court did not need to, and did not, reach that issue.

With the indigenous plaintiffs having re-filed the *Aguinda* action in *Lago Agrio*, Ecuador, and with Chevron having lost its indemnification action against the Republic in the Southern District of New York, Chevron filed a Notice of Arbitration on September 23, 2009 under the arbitration rules of the United Nations Committee on International Trade Law ("UNCITRAL")[12] at the Permanent Court of Arbitration in The Hague, Netherlands pursuant to Article VI(3)(a) of the Ecuador-U.S. Treaty.[13] Chevron thereby injected into a third forum—the present Treaty Arbitration—issues identical to those that had already

---

[12] *See* SER 125, Chevron Corp. and Texaco Petroleum Co.'s Notice of Arbitration (Sept. 23, 2009). Interestingly, Chevron filed its Notice of Arbitration challenging its liability in Ecuador before the *Lago Agrio* Court even issued its decision.

[13] SER 151, Treaty Between the United States of America and the Republic of Ecuador concerning the Encouragement and Reciprocal Protection of Investment, at Art. VI(3)(a) signed August 27, 1993.

been placed before the U.S. District Court for the Southern District of New York and the *Lago Agrio* court.

Thus, in the present arbitration, Chevron resuscitates its claims that the Republic is violating its contractual release by "allowing" the *Lago Agrio* Court to hear the very environmental claims that Chevron asked the U.S. federal courts to dismiss in favor of an Ecuadorian forum. SER 141-142 at ¶¶ 66-68. Chevron also claims that the Republic has violated Chevron's rights under the Ecuador-U.S. Treaty by failing to afford it due process in the environmental litigation. *Id.* at ¶¶ 68-69. As part of these allegations, Chevron argues that the Ecuadorian proceedings have been tainted by corruption and collusion involving the Government of Ecuador, its courts and the plaintiffs. *Id.*

Chevron has introduced as evidence in the Treaty Arbitration twenty-eight of its *Lago Agrio* environmental expert reports, one of which incorporates by reference another forty expert reports. And Chevron has argued from these reports that the scientific evidence overwhelmingly supports a finding that the affected lands and waters present no health dangers or risks at all, and that, alternatively, the lands have been effectively remediated. This evidence, Chevron suggests, supports its arbitral contention that any adverse judgment from the Ecuadorian judiciary must be the product of fraud. *See e.g.*, SER 251, 324, Chevron's

Memorial on the Merits, *Chevron Corp. and Texaco Petroleum Co. v. Republic of Ecuador*, PCA Case No. 2009-23 (Sept. 6, 2010).

### D. The *Lago Agrio* Court Issues A Multi-Billion Dollar Judgment Against Chevron

Shortly after Chevron instituted the present Treaty Arbitration, almost eighteen years after the private Ecuadorian plaintiffs first brought their action in New York, and eight years after the Plaintiffs commenced the environmental suit in Ecuador, on February 14, 2011, the *Lago Agrio* court issued a judgment against Chevron and in favor of the private plaintiffs. As summarized by Chevron, among other things, the court ordered damages for reparation in the following amounts:

- $600 million for groundwater remediation;
- $5.396 billion for soil remediation;
- $200 million to restore native flora, fauna, and aquatic life;
- $150 million to implement a potable water system in the allegedly affected areas;
- $1.4 billion to establish a healthcare system to remediate the impacts of the pollution on the population of the affected communities;
- $800 million for "a plan of health," including potential cancer treatment for the most seriously affected citizens; and
- $100 million to rebuild ethnic communities and indigenous culture.[14]

---

[14]     SER 638-647, Letter from Randy M. Mastro to Judge Lewis A. Kaplan (Feb. 24, 2011), transmitting certified copy of Judgment in *Maria Aguinda y Otros v. Chevron Corp.* No. 002-2003, Provincial Court of Sucumbrio (Feb. 14, 2011), submitted in *Chevron Corp. v. Donziger, et al.*, No. 11-CV-0691 (LAK) ("*Lago Agrio* Judgment"); the *Lago Agrio* Court subsequently adjusted its damages award upward to approximately $19 billion.

Pursuant to Ecuadorian law, the court also ordered Chevron to pay an additional 10 percent to the Amazon Defense Front—an organization representing the Plaintiffs.[15]  In addition, the court ordered Chevron to pay what Chevron argues is a "punitive penalty" of 100 percent of the reparations damages if it did not issue a public apology within fifteen days of the judgment.[16]  Both parties appealed the court's judgment—a judgment to which Ecuador is not a party.

Though most of the voluminous evidence in the record was undisputed by Chevron, it had alleged that two of the expert reports were tainted by corruption. The *Lago Agrio* court, while declining to find fraud or corruption, nonetheless granted Chevron's request to disregard the reports submitted by both of the disputed experts.[17]  The court instead found Chevron liable, and awarded damages, based on the voluminous remaining testing data and scientific evidence before it.

Since the granting of the Section 1782 applications at issue here—on January 3, 2012—the first-level court of appeals in Ecuador affirmed the *Lago Agrio* trial court's decision.  Shortly thereafter—on January 20, 2012—Chevron

---

[15]    *Id*. at SER 646.

[16]    *Id.* at SER 645.

[17]    *Id.* at SER 508 (disregarding the Calmbacher Report); SER 510 (disregarding the Cabrera Report).

appealed that affirmance to the National Court of Justice. That appeal is still pending.

### E.    Kelsh's And Mackay's Involvement In Ecuador For Chevron And The Importance Of The Discovery Sought By The Republic To The Treaty Arbitration

Kelsh, an epidemiologist, served as an expert witness designated by Chevron in the *Lago Agrio* litigation. ER 14. He submitted various expert reports in response to claims made in the global damages report of the court-appointed expert, Richard Cabrera. *Id.* Kelsh's rebuttal reports challenged Plaintiffs' claims of excess cancer deaths, other health problems, and the need for additional health care infrastructure. *Id.* These reports, as well as others authored by Kelsh, were later introduced by Chevron in the Treaty Arbitration. *Id.*

Mackay likewise provided expert testimony in support of Chevron in the *Lago Agrio* case—in written reports authored in 2006, 2007, and the fall of 2010. Br. 17, ER 51. The principal topic on which Mackay opined was the state of the soil and groundwater in the geographic area under scrutiny in the *Lago Agrio* litigation, and the parties' respective sampling and analysis practices. Br. 17.

In the discovery requests at issue here, the Republic seeks evidence from Kelsh and Mackay in part to better understand the critical science underlying Chevron's claims and to respond to Chevron's allegations in the Treaty Arbitration. While Chevron and the indigenous plaintiffs have litigated these

matters for the better part of two decades, the Republic (through its lawyers, rather than through its courts) has had no reason until recently to delve into the underlying science—because Chevron had not injected these issues into its dispute with the Republic until it launched the Treaty Arbitration.

Critically, the Republic also seeks to determine whether Chevron may have employed testing techniques deliberately designed to skew the results and "guarantee" the findings it desired. Documents produced to the Republic in another 1782 action strongly suggest that Chevron engaged in extensive, unilateral "pre-inspections" at many of the judicial inspection sites. *See, e.g.*, SER 650, Judicial Inspection Playbook for Sacha Norte 1 (Apr. 2006). From the massive amounts of sampling data generated, Chevron and its experts then appear to have "cherry-picked" specific, "cleaner" site locations for further supposedly "random" testing as part of the judicial inspections. The Republic now believes that a more robust review of *all* of Chevron's pre-inspection site sampling data will (1) disprove many of the expert reports Chevron filed with the *Lago Agrio* Court,[18]

---

[18]     *See, e.g.*, SER 676, Pedro J. Alvarez, Douglas M. Mackay, Robert E. Hinchee, *Evaluation of Chevron's Sampling and Analysis Methods* (Aug. 28, 2006) ("the sample selection . . . methods used are appropriate and are consistent with common practices and standards used by governments, companies, and consultants involved in the environmental remediation business worldwide . . . . We believe there is no foundation for the serious allegations in the Maest 3/06 report, including the allegation that the sampling program that Chevron's experts are

14

and (2) show pollution at sites where Chevron, based on its pre-selected "representative" samplings, has repeatedly denied that evidence of pollution even exists.

For example, the Republic has recently learned from a Section 1782 request directed at another Chevron expert that Chevron created a "Judicial Inspection Playbook" for the inspection of the Sacha Norte 1 Production Station. That Playbook includes a section on "Chevron Site Inspections, 2004-2006," covering four such inspections, and strongly suggesting that Chevron was attempting through its experts to skew the results of the judicial inspections in various ways.[19]

conducting deliberately hides or minimizes the existing contamination and associated risks.").

[19]  The Playbook's narrative includes the results of various pre-inspection "delineation borings" at two pits closed in 1986, Chevron's purpose being to establish "clean" sampling points for use in the judicial inspections:

> The second closed pit was associated with a former flare and was near the current location of the AS-114 wellhead. A hand augur boring within the pit (SA NORTE1-P1-SB41) encountered degraded petroleum below 0.9 m of clean cover, and an impacted interval that extended to at least 3.1 m (TPH-DRO = 5100 mg/kg, TPH GRO = 49 mg/kg), and a second boring (SA-NORTE1-P1-SB42) to the NW also encountered impacted soil below 2.8 m (TPH-DRO = 440 mg/kg). [Defint TPH-DRO']  A visually clean delineation point for this pit was established with a third boring (SA-NORTE1-P1-SB43) located 100 m NW of the first boring, although analysis of the sample revealed TPH DRO of 20 mg/kg . . . . Two borings were collected N of the flare outside the fence line and one (SA-NORTE1-P1-SB45) **established a clean delineation** for the former pits and discharges from the former effluent pipes. No impacts were noted to a depth of

The Republic received the information described above as a result of Section 1782 discovery directed at another Chevron expert, who was involved in four judicial inspections.  The Republic anticipates that Mackay, who was involved in the judicial inspections, *e.g.*, SER 675, will be able to provide discovery sufficient for the Republic to determine whether Chevron employed such tactics throughout the inspection process, thereby casting substantial doubt on the validity and reliability of Chevron's expert reports first submitted to the *Lago Agrio* Court, and more recently to the Treaty Arbitration Tribunal.

---

3.2 m in this **clean delineation** boring.  The second boring (SA-NORTE1-P1-SB44) was drilled to 0.5 m in a historic drainage ditch and was not visually impacted, but analysis of a composite sample determined that 1800 mg/kg of TPH DRO was present.

SER 656, Judicial Inspection Playbook for Sacha Norte 1 (Apr. 2006) (emphases added).

The pre-inspection test results were then used to instruct Chevron's experts where they should sample during the actual judicial site inspections, so as to yield a "clean" sample result.  Thus, in order to accomplish Chevron's stated objective of "[d]efin[ing] clean line around site to show no widespread impacts," Chevron's judicial inspection expert for Sacha Norte 1 admonished that "[l]ocations for perimeter sampling should be chosen **to emphasize clean points around pits when possible**."  SER 737-738 (quoting Mackay Dkt. 35-10, Summary of Sampling and Testing Program for Judicial Inspection Sites:  Sacha Norte 1 Production Station Strategy, at BJORKMAN00046359) (emphasis added).  And to achieve that end, the expert was to "[c]ollect soil samples at 4 or more locations surrounding the site, **using locations that the PI [pre-inspection] team has shown to be clean**."  *Id*. (emphasis added).

The Republic therefore needs, and as explained below is entitled to, discovery from Kelsh and Mackay to defend itself in the Treaty Arbitration, through which Chevron seeks a multi-billion dollar arbitral award against the Republic.

### F.    Kelsh, Mackay, And Chevron Are Withholding Documents Based On Mistaken Claims Of Work Product Protection

The courts below granted the Republic's Section 1782 Applications and ordered that the subpoenas sought by the Republic be served on Kelsh and Mackay.  ER 265 (Kelsh); ER 55 (Mackay).  In turn, Kelsh and Mackay, under Chevron's supervision, withheld from production thousands of documents on the ground that they were protected against discovery by the attorney work product doctrine.   The Republic then filed motions to compel, setting out specific objections to *each* disputed claim of privilege on Kelsh and Mackay's privilege logs.  *See* SER 691, Motion to Compel and Annex A, *In re Application of the Republic of Ecuador* (Kelsh), No. 11-mc-80171 (N.D. Cal. Nov. 18, 2011); SER 723, Joint Statement Regarding Discovery Disagreement, *In re Application of the Republic of Ecuador* (Mackay), No. 11-mc-00052 (E.D. Cal. Dec. 27, 2011); SER 752, Annex A to Joint Statement Regarding Discovery Disagreement, *In re Application of the Republic of Ecuador* (Mackay), No. 11-mc-00052 (E.D. Cal. Dec. 27, 2011).

As explained below in detail, and as the courts below agreed, the only documents in Kelsh and Mackay's files that are *not* discoverable under Rule 26 are Kelsh and Mackay's (i) draft reports and (ii) certain communications with counsel. *See* Fed. R. Civ. P. 26(b)(4)(B)-(C).   Kelsh is nonetheless withholding from production:

- Emails exchanged between Kelsh and other Chevron non-attorney experts, agents, and employees concerning matters addressed in Kelsh's reports.  (706 documents withheld).

- Emails on those matters exchanged between Kelsh and other Chevron non-attorney experts, agents, and employees where an attorney is listed as one of numerous recipients.  (15 documents withheld).

- Memoranda, draft memoranda, draft letters, notes, worksheets, draft worksheets, presentations, outlines, and agendas on those matters and authored by Kelsh or other Chevron non-attorney experts, agents, and employees.  (408 documents withheld).

- Redacted documents on those matters authored by Kelsh whose distributions are unknown.  (3 documents withheld).

- Draft reports on the same matters authored by *other* Chevron experts (28 documents withheld).

Similarly, Mackay has produced and now seeks the return of:

- Emails concerning matters addressed in Mackay's reports and exchanged between Mackay and other Chevron non-attorney experts, agents, and employees.  (573 documents withheld).

- Emails on those subjects exchanged between Mackay and other Chevron non-attorney experts, agents, and employees where an attorney is listed as one of numerous recipients.  (18 documents withheld).

- Memoranda, notes, workplans, draft worksheets, outlines, and agendas on those subjects and authored by Mackay or other Chevron non-attorney experts, agents, and employees. (72 documents withheld).

Finally, the Republic does not challenge the assertion of work product protection of Kelsh and Mackay's draft reports. The Republic, however, does challenge the breadth of their assertions as to what constitutes a draft report. Kelsh alone has asserted work product protection over 648 "draft reports," and Mackay has asserted work product protection over 232 "draft reports." Including these 880 documents, there are thus 2,703 withheld documents at issue in these appeals. *See* Annexes A, SER 712 (Kelsh); SER 752 (Mackay) (setting out the Republic's specific objections to each privilege claim).

### G.    The Courts Below Agree That Chevron's Assertions Of Work Product Protection Are Overbroad

In deciding the Motions to Compel brought by the Republic against Chevron, the courts below have uniformly agreed that Rule 26 means what it says and protects from disclosure only (i) draft reports and (ii) certain communications between the expert and Chevron. Confronted with the Republic's document-specific objections, the district courts summarily affirmed rulings by their respective Magistrate Judges and agreed that Chevron's assertions of work product beyond these two "defined exceptions" were without merit. *E.g.*, ER 16.

Specifically, following an *in camera* review of the documents at issue here, the *Kelsh* Court found that "expert materials that fall outside the scope of Rule

26(b)(4)(B)-(C) are not work product and are, therefore, discoverable." ER 19. It also disallowed Kelsh's assertion of attorney work product protection of documents in his own files. As the district court put it, "[t]he intention of the work product rule is to protect the mental impressions and legal theories of a party's attorney, not its experts." ER 21 (citation omitted).[20] And on that basis the court ordered Kelsh to produce categories of non-protected documents.

The *Mackay* Court was equally on point in ordering the production of these same types of documents:

> [T]his Court finds that under Rule 26, Respondents are required to produce every document listed on their privilege log(s) unless it falls under one of the following two categories: (1) Draft reports prepared by Mackay; and (2) Communications directly between Mackay and counsel that contain counsel's legal strategies and/or mental impressions.

ER 8-9, (ordering in camera review of draft reports to determine whether documents withheld were indeed draft reports).

---

[20]    The court nonetheless rejected the Republic's position that Chevron was barred from objecting to the propounded discovery based on the doctrine of judicial estoppels. The court instead found that Chevron was not judicially estopped from arguing a position contrary to one it had argued in related Section 1782 applications. ER at 18-19.

The courts below also ruled and agreed with Chevron that the version of Rule 26 as it existed before the 2010 was inapplicable to this dispute and that Kelsh was a reporting expert under Rule 26 and not a fact witness or non-reporting testifying expert for the Treaty Arbitration. In the interests of judicial economy, the Republic has elected not to challenge these rulings on appeal. *See* ER 16, 18 (Kelsh); ER 8 (Mackay).

## <u>SUMMARY OF ARGUMENT</u>

The arguments espoused by Chevron here, that narrowly tailored amendments to Rule 26 somehow extended general work product protection to independent, third-party experts, is untenable.

Chevron's argument rests on an analysis of Rule 26(b)(3)'s "plain language" that is superficially—but only superficially—attractive.  According to Chevron, that rule extends general work product protection to any document prepared "by or for" a party or its attorney.  *See* Br. 25-32.  Because a testifying expert is retained by a party or its attorney, and in that sense performs his or her work "for" them, anything in the expert's files, in Chevron's view, has necessarily been prepared "for" the party or its attorney.  *Id.* at 23-24.  But this simplistic reading of the Rule's text has several fundamental problems.

First, as we explain below in Section I.A, Chevron's position is belied by the 2010 amendments, which for the first time granted protection to two specific types of expert-related materials—draft reports and communications from the party's attorney.  *See* Rule 26(b)(4).  If Chevron's reading of Rule 26(b)(3)'s "by or for" language were correct, it would not be have been necessary to add these new provisions:  they would be superfluous.  Moreover, under the *espressio unius* principle, the Rule's express protection of two specific categories of expert-related

materials impliedly forecloses Chevron's effort to extend that same protection to other, unenumerated categories.

Chevron's position is also contradicted by the 2010 Advisory Committee Notes, which make clear that the amendments do not impair the existing, settled right to broad discovery from experts, other than the limitation that (i) draft reports and (ii) certain attorney communications are not discoverable. Moreover, the history of Rule 26 and the many interpretive decisions in this and other circuits support the principle that testifying experts may not invoke work product protection in the way Chevron suggests here.

What, then, does the "for" portion of the phrase "by or for a party or its representative" really mean? As we show in Section I.B., the history of Rule 26 demonstrates that in 1970, when the work product protection was added to the Rules, this phrase was a term of art. And for a document to be considered as having been prepared "for" a party or attorney, the preparer had to be an agent of one of them. *See Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995). Indeed, absent that limitation, *any* document prepared at the mere behest of an attorney—including documents prepared by the opposing party or an independent witness—would become non-discoverable except on a showing of substantial need. Accordingly, under the "term of art" canon, the phrase "by or for a party or its representative" should be given the meaning it had when the Rule was adopted

in 1970. And for that reason a document should be considered as having been prepared "for" a party or its attorney *only* if the preparer was an attorney or a agent.

That principle is dispositive here. In 1970, it was well established, as it is today, that an expert witness is not an agent of the party or attorney who retains her. Indeed, if a testifying expert were considered an *agent* of the party or the attorney, her opinions would lack the independence necessary for those opinions to be useful and therefore admissible under Federal Rules of Evidence 702. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th. Cir. 1995). Moreover, because a testifying expert is not an agent of the party or its attorney, it is equally well settled that, except for communications directly from an attorney to the expert, any work product protection that may exist is lost when a document is provided to the expert.

As we demonstrate in Section I.C., in the decisions under review here, both district courts correctly applied these principles in denying work product protection to the three categories of documents at issue in these appeals. And Chevron's *only* challenge to those decisions is their failure to apply its sweeping—and newly discovered—interpretation of Rule 26(b)(3)'s "by or for" proviso.

If necessary, as explained in Section II, the Court should also affirm the orders in the Court below on either of the alternative grounds. First, Chevron

23

espouses a position here that is contrary to that which it has taken in other related Section 1782 applications where it was seeking discovery for its own use. It repeatedly argued that under Rule 26, as amended in 2010, testimonial and documentary privileges do *not* extend to testifying expert witnesses. Having prevailed in its argument in other courts, Chevron is judicially estopped from arguing the opposite premise here to its advantage.

Second, in any event, the Republic has a substantial need for the discovery sought from Chevron, and that substantial need trumps Chevron's assertions of attorney work product. Without the discovery sought by the Republic, it cannot determine whether Chevron did indeed "cherry pick" the data it relied on in the *Lago Agrio* litigation, while deliberately ignoring inculpatory facts or data. The propriety of Chevron's expert analysis in *Lago Agrio* has been placed at the center of the Treaty Arbitration, where Chevron so ardently complains that the *Lago Agrio* court "got it wrong" by finding them liable for $18 billion.

For each of these independent reasons, the decisions below must be affirmed.

## STANDARD OF REVIEW

This Circuit reviews district court rulings on discovery matters, such as those at issue here, under the highly deferential abuse of discretion standard. *See R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1245 (9th Cir. 2012)

("This Court reviews the district court's rulings concerning discovery . . . for abuse of discretion") (internal quotations omitted); *Ibrahim v. Dept. of Homeland Sec.*, 669 F.3d 983, 992 (9th Cir. 2012); *Nevada Dept. of Corrs. v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011); *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011); *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1015 (9th Cir. 2010). Although a material legal error generally constitutes an abuse of discretion, as we will show, Chevron has failed to establish any such error by either of the courts below.

## **ARGUMENT**

I.    **Chevron's Argument That The District Court Violated The "Plain Meaning" Of Rule 26 In Denying Work Product Protection To Documents Located In Expert Witness Files Is Patently Incorrect**

Chevron's central argument—that the work product doctrine protects documents prepared "for" a party in anticipation of litigation regardless of the role played by the person preparing the documents or their location—is patently incorrect. As this Court has long held, the work product doctrine, as set forth in Fed. R. Civ. P. 26(b)(3)(a), protects "from discovery documents and tangible things prepared by a *party* or *his representative* in anticipation of litigation." *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989) (emphasis added). And the Supreme Court originally adopted the work product doctrine to protect an *attorney's* thought processes by creating a "certain degree of

privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). While the doctrine has since been expanded to include an attorney's *agents, United States v. Nobles*, 422 U.S. 225, 239 (1975), Chevron's sweeping interpretation of the Rule's "by or for" language would expand work product protection far beyond that permitted by the Rule, its drafters, or the Supreme Court. As we now show, that proposed interpretation violates settled principles of statutory construction even as it ignores the doctrine's history, purpose, and long-settled limitations. Once those limitations are understood, it is apparent that the courts below acted well within their discretion in denying work product protection to the specific categories of documents at issue here.

### A. Chevron's Sweeping Interpretation Of Rule 26(B)(3)'s "By Or For" Language Would Violate Settled Principles Of Statutory Construction While Contravening The Advisory Committee's Understanding Of Its Own Amendments And The Rule's History

Chevron argues that materials prepared by or supplied to its testifying experts (and in-house non-attorney staff) fall within its sweeping interpretation of materials prepared "by or for" a party in anticipation of litigation. Br. at 25. But Chevron's broad interpretation of "by or for" to include documents created by or given to testifying experts would make the new provisions of Rule 26(b)(4) unnecessary surplusage. This cannot be.

### 1. Chevron's Interpretation Violates The "Meaning To Every Clause" And "Espressio Unius" Principles

Chevron's argument is predicated on its claim that the recent amendment of Rule 26(a)(2)—which deals with voluntary *disclosures* of expert-related materials-- somehow altered the work product rule in 26(b)(3) applicable to *discovery*. Br. at 28. That is false. It is obviously not supported by the text, since Rule 26(b)(3) was not amended. Nor is it supported by anything in the Rule 26 Advisory Committee Notes. The only connection between Rule 26(a)(2) and work product appeared in the 1993 Advisory Committee Notes, "[L]itigants should no longer be able to argue that materials furnished to their [testifying] experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure."

The 2010 amendment merely changed "facts and other information" in Rule 26(a)(2)'s voluntary disclosure provision to "facts and data" because courts had interpreted the words "other information" to require disclosure of communications between experts and *attorneys*. The Advisory Committee notes make clear that this was the only purpose of the change: "This amendment is intended to alter the outcome in cases that have relied on the 1993 formulation . . . The amendments to Rule 26(b)(4) make this change explicit . . ." Rule 26 Advisory Committee Notes (2010). Thus, the corresponding amendment of Rule 26(b)(4) provided that attorney-expert witness communications were *for the first time* protected by the

27

work product rule, subject to an exception for facts and data—thereby making that rule consistent with the amendment of Rule 26(a)(2) and its initial disclosure requirements.

Chevron's argument assumes that anything in a testifying expert's files that was created "by or for" a party in anticipation of litigation already fell within the work product protection of Rule 26(b)(3), but that this protection was effectively nullified by judicial interpretations of Rule 26(a)(2)'s requirement to disclose facts and "other information."   But if that were true, *all* that would have been necessary to restore this supposed work product protection for testifying experts would have been to change "facts and other information" in Rule 26(a)(2) to "facts and data." There would have been no need to add the narrow protections for draft reports and attorney communications in Rule 26(b)(4)(C).   Under Chevron's view of the general work product protection in Rule 26(b)(3), then, the new express protections in Rule 26(b)(4)(C) were surplusage.

But that interpretation flies in the face of the settled "rule against superfluities:"   "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.   It is our duty to give effect, if possible, to every clause and word of a statute." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations and citations omitted).   If, as Chevron

28

argues, work product protection now extends to documents created by or given to testifying experts, there would have been no need for the Advisory Committee to add protections for draft reports and attorney-expert communications in Rule 26(b)(4)(C). Chevron's sweeping interpretation of the "by or for" language in Rule 26(b)(3) thus makes the subsequently added protections in Rule 26(b)(4)(C) "superfluous."

Chevron's attempt to anticipate this obvious problem (Br. at 31) runs headlong into another settled principle of statutory interpretation—the "espressio unius" principle, which holds that a drafter's inclusion of one thing (or in the case of the 2010 Amendments, two things) necessarily implies the *exclusion* of other things. *See, e.g.*, *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) (applying maxim "*espressio unius est exclusio alterius*."); *Nat'l R.R. Passenger Corp. v. Nat'l Assn. of R.R. Passengers*, 414 U.S. 453, 458 (1974). Under that principle, because the 2010 amendments to Rule 26(b) identify two specific protections available to testifying experts—draft reports and certain attorney expert communications—other work product protections must be considered to be excluded. Chevron's claim that these enumerated exceptions in Rule 26(b)(4) "are merely *aspects* of the broader protection provided by Rule 26(b)(3)(A)," Br. at 21, 22, and its contention that if these were the only protections for expert documents

and communications, "the Rules would have said so," Br. at 31, contravene this settled principle of statutory construction.

In short, as a matter of statutory interpretation, Chevron's sweeping interpretation of the "by or for" language in Rule 26(b)(3), and Chevron's correspondingly expansive view of the impact of the change from "facts and other information" to "facts and data" in Rule 26(a), are untenable.

> **2.    Chevron's Interpretation Cannot Be Reconciled With The Advisory Committee's Stated Intention To Preserve Broad Discovery Of Expert-Related Materials Other Than Draft Reports And Direct Attorney-Expert Communications**

This conclusion is confirmed by the Advisory Committee notes to the 2010 amendments.  There, the Advisory Committee repeatedly made it clear that those amendments were intended to address only two discrete issues—discovery of draft reports and certain attorney communications—and that they were *not* intended to otherwise impair the traditional broad discovery of expert witnesses:

> Rules 26(b)(4)(B) and (C) *do not impede discovery* about the opinions to be offered by the expert or the *development, foundation, or basis of those opinions*.  For example, the expert's testing of material involved in litigation, and *notes* of any such testing, would not be exempted from discovery by this rule.  Similarly, inquiry about *communications the expert had with anyone other than the party's counsel* about the opinions expressed is *unaffected by the rule*.

Rule 26 Advisory Committee Notes (2010) (emphasis added).

30

Chevron omits or misquotes much of the relevant Advisory Committee notes in an effort to avoid the intended limited scope of the 2010 amendments. To begin, the Advisory Committee makes clear that "[t]he intention is that 'facts or data' be interpreted broadly to require disclosure of *any* material considered by the expert, from *whatever source*, that contains *factual ingredients*." Rule 26 Advisory Committee Notes (2010) (emphasis added). Thus, as the Advisory Committee observes, the 2010 amendments had a limited intent; they were

> intended to alter the outcome in cases that have relied on the 1993 formulation in requiring disclosure of *all attorney-expert communications and draft reports*. . . . The refocus of disclosure on "facts or data" is meant to limit disclosure to material of a factual nature by excluding theories or mental impressions of *counsel*.

Rule 26 Advisory Committee Notes (2010) (emphasis added).

Chevron's selective quotation of this section is telling. Br. at 33 ("In amending Rule 26, the Rules Committee specifically stated that the 2010 changes . . . were '*intended to alter the outcome*' of earlier decisions that limited collaboration and coordination with testifying experts"). Read in full, the notes make clear that the amendments were not *generally* intended to alter the outcome of prior disputes, as Chevron would have it, but instead to alter the outcome only as to two limited categories of documents, draft reports and attorney core work

product.[21]   Indeed, "inquiry about communications the expert had *with anyone other than the party's counsel* about the opinions expressed is unaffected by the rule."  Rule 26 Advisory Committee Notes (2010) (emphasis added); *see also id*. ("The refocus of disclosure on 'facts or data' is meant to limit disclosure to material of a factual nature by *excluding theories or mental impressions of counsel*.") (emphasis added); *see id*. ("inquiry about communications the expert had with *anyone other than the party's counsel* about the opinions expressed is unaffected by the rule").

In making clear that the amended rule is not intended to "impede discovery about the opinions to be offered by the expert or the development, foundation, or basis of those opinions," the Advisory Committee confirmed that the amendments do not represent the seismic shift in discovery practice that Chevron seeks.  To the contrary, the amendments were, as the Advisory Committee noted, intended "to

---

[21]   *See Republic of Ecuador v. Bjorkman*, 11-cv-01470-WYD-MEH, 2012 WL 12755, at *3 (D. Colo. Jan. 4, 2012) ("The Advisory Committee makes clear that the amendments are meant to alleviate the perceived uncertainty and rising costs associated with attorneys' limited interactions with their retained experts as a result of court opinions allowing discovery of an expert's draft reports and of all communications with counsel.  The language of Rule 26(a)(2)(B) was amended specifically for these purposes.").

alter the outcome" only with respect to those cases touching on disclosure of "attorney-expert communications and draft reports."[22]

> **3.      Chevron's Interpretation Cannot Be Reconciled With The Long History Of Rules 26 And Its Interpretation By The Courts**

The history of and case law interpreting Rule 26 reaffirms the long-standing, general principle that testifying experts may *not* invoke privilege to shield disclosure of qualified (i.e., non-attorney) work product, whether documents or communications.  For example, in a case decided shortly after *Hickman v. Taylor*, 329 U.S. 495 (1947), the Sixth Circuit said:  "The obvious purpose of the Federal

---

[22]      It is equally clear that the Advisory Committee did not contemplate that the term "the party's attorney" would encompass anyone other than counsel:  "[T]his protection does not extend to the expert's own development of the opinions to be presented; those are subject to probing in deposition or at trial."  Rule 26 Advisory Committee Notes (2010).  Accordingly, Chevron's view that Kelsh and Mackay's communications with other experts in the *Lago Agrio* litigation pushes both the plain meaning and interpretive guidelines contained in the Advisory Committee notes too far, as other courts in related Section 1782 actions have agreed.  *See* SER 758-759, Order, *Chevron Corp. v. Barnthouse*, No. 1:10-mc-00053, at 2-3 (S.D. Ohio Dec. 8, 2010); *accord. Bjorkman*, 2012 WL 12755, at *4 ("Documents containing communications between Bjorkman (and/or his assistant(s)) and individuals who are not Chevron attorneys may not be withheld."); Memorandum Order, *Chevron Corp. v. Weinberg Group*, No. 11-mc-00030, at 9 n.5 (D.D.C. Sept. 8, 2011) ("The Weinberg Group provides me no reason to conclude that its communications with the experts was shielded by a privilege that protects confidential communications between a client and an attorney . . . ."); Memorandum and Order, *In re Chevron Corp.* (Allen), No. 2:10-mc-91, at 15 (D. Vt. Dec. 2, 2010) (permitting Chevron's discovery of communications between an expert and another third party).

Rules of Civil Procedure . . . to broaden the scope of inquiry of an adverse witness or party . . . gainsays the thought that the [work product doctrine announced in *Hickman*] should be liberally extended to cover information sought of one who is not a lawyer, but has merely been retained by an attorney-at-law as an expert in a scientific field." *Sachs v. Aluminum Co. of Am.*, 167 F.2d 570, 570-71 (6th Cir. 1948). And in 1967, the Fifth Circuit in *United States v. McKay*, 372 F.2d 174, 177 (5th Cir. 1967) adopted the same position. *McKay* acknowledged that an expert report had been secured "in anticipation of tax litigation" but distinguished *Hickman*, stating: "In the present case, the appraisal report which the Commissioner seeks to inspect is in no sense the work product of the lawyer, McKay. On the contrary, it would appear to be solely the work product of the expert witnesses whom he employed to prepare it." *Id.* at 177.

Shortly thereafter, in *United States v. Meyer*, 398 F.2d 66, 74 (9th Cir. 1968), this Court likewise held that an expert's "opinions and the data and analyses upon which they rest . . . do not become the work product of the attorneys . . . ; they are not immunized from discovery merely because the appraisers may have set them out in reports to counsel." *See also 8A* C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure* § 2029, p. 17-18, n. 12 (2010) ("*Wright & Miller*") ("The knowledge of an expert is not privileged, it is not part of the work product").

These holdings became incorporated in Rule 26(b). The Advisory Committee Notes to the 1970 amendments—which first formulated the work product doctrine of Rule 26(b)(3) and the expert discovery rules of Rule 26(b)(4)—cited *United States v. McKay* with approval. In so doing, the Notes stated that the "new provisions of subdivision (b)(4) repudiate the few decisions that have held an expert's information privileged . . . [and] *reject as ill-considered the decisions which have sought to bring expert information within the work-product doctrine*." (Emphasis added.)

The text of the 1970 version reinforced the conclusion stated in the Advisory Committee Notes in two ways. First, on its face, the rule does not apply to testifying experts—they are not mentioned, unlike consultants, who are addressed in a separate rule.[23] Second, the work product rule included a proviso in the opening sentence, still in the current rule, subjecting the Rule 26(b)(3) work product rule to the broad expert discovery rule in Rule 26(b)(4).[24]

---

[23]     As noted above, testifying experts are not agents. *Cf. U.S. v. Nobles*, 422 U.S. at 237, extending work product protection to investigators ("attorneys often must rely on the assistance of *investigators and other agents* in the compilation of materials in preparation for trial") (emphasis added).

[24]     Whether this proviso applied only to documents and tangible things prepared in anticipation of litigation, *i.e.*, qualified work product, or also to an attorney's mental impressions, i.e., core work product, led to a split of authority. *Compare Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 594-95 (3rd Cir. 1984) (core work product protected) *with Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 388-89

The 1993 amendments to Rule 26 led to expanded disclosure of both qualified and core work product under the "bright-line" waiver rule followed by some courts. *See In re Pioneer Hi-Bred Int'l, Inc.,* 238 F.3d 1370, 1375 (Fed. Cir. 2001) (finding that all documents "disclosed to a testifying expert in connection with his testimony are discoverable by the opposing party"); *see also Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 714 (6th Cir. 2006). But the 1993 expansion was not based on the text of the existing work product and expert provisions, subdivisions (b)(3) and (b)(4) of Rule 26, which remained materially unchanged and continued to provide no textual support for the application of the qualified work product doctrine to testifying experts.

But as the 2010 Advisory Committee Notes reveal, this "bright line" rule requiring disclosure of core work product in testifying experts' files fell out of favor. To effect the desired change, the Advisory Committee made discrete changes aimed at the source of the authority—the phrase "other information"— contained in the initial disclosure provision in Rule 26(a)(2). As noted, the Advisory Committee replaced "other information" with "facts" in Rule

---

(N.D. Cal. 1991) (holding that the *proviso* applies to both qualified and core work product). But from the beginning, no decision has ever held that qualified work product in a testifying expert's file is protected from discovery. *Sachs, supra*, 167 F.2d 570; s*ee also United States v. Nobles*, 422 U.S. 225, 237 (1975) (party's election to present agent-investigator as witness waived work product protection).

26(a)(2)(B)(ii), and added two specific exemptions from discovery in the expert rule, Rule 26(b)(4)—for draft reports and for communications between the party's attorney and the reporting expert containing core work product. What did not change, however, was Rule 26(b)(3)'s scope—which still does not extend work product protection to testifying experts—and the proviso in the same paragraph that discovery of qualified work product is "subject to Rule 26(b)(4)"—a reference that includes the same overarching authorization to depose testifying experts that has been in the Rule since 1970.[25]

Chevron's argument that the amendment of Rule 26(b)(4) to protect draft reports and core attorney work product somehow overrode the entire history, structure and text of these rules is fatally undermined by the continued existence of Rule 26(b)(4)(A), whose plain meaning authorizing expert discovery has been well understood since its adoption in 1970. Rule 26 still makes discoverable all other materials contained in the files of a testifying expert.

---

[25] Deposition discovery perforce includes the production of documents under Rule 34 and Rule 45. *See* Rule 26 Advisory Committee Notes (2010) ("The most frequent method for discovering the work of expert witnesses is by deposition, but Rules 26(b)(4)(B) and (C) apply to all forms of discovery").

**B.     Properly Understood, The *General* Rule Under Rule 26(b)(3) That Materials Prepared "By Or For" A Party Are Protected Work Product Does Not Extend To Documents Prepared By Or Provided To Third Parties, Like The Testifying Experts Here, Who Are Not Agents Of The Party Or The Attorney**

Having established the implausibility of Chevron's argument that the 2010 amendments somehow expanded the scope of Rule 26(b)(3) to protect all materials in a testifying expert's files other than "facts and data," it remains to explain exactly what expert-related materials Rule 26(b)(3) does and does not protect.  As we now show, Chevron's attempt to shield from discovery the documents at issue here—documents (other than draft reports and attorney-expert communications) prepared by or given to testifying experts—is erroneous.  First and foremost, these documents do not fall within the general principle of Rule 26(b)(3) protecting documents prepared "for" an attorney or a party, because that phrase is term of art that is limited to *agents* of the attorney or party.  In addition, Chevron's argument ignores that the documents here either were never protected at all, or that any protection they had was waived when they were disclosed to a testifying expert.

**1.     A Document Can Only Be Deemed To Have Been Created "For" An Attorney Or A Party If It Was Created By Their Agent**

It is a cardinal rule of statutory construction that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice it presumably knows and adopts the cluster of ideas that were attached

to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U. S. 246, 263 (1952); *see also NLRB v. Amax Coal Co.*, 453 U. S. 322, 329 (1981); *Braxton v. United States*, 500 U. S. 344, 351 (1991). Where a term of art is so adopted, "absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette*, 342 U.S. at 263.

Here, by the time the term "by or for a party" was adopted into the Federal Rules, at least two states had promulgated identical formulations of the work product rule. In both of those states, Illinois and New York, the general work product doctrine was understood to extend only to an attorney and his agents, and no further. *See Monier v. Chamberlain*, 35 Ill. 2d 351, 358-59 (Ill. 1966) (finding that "only those memoranda, reports or documents which reflect the employment of the attorney's legal expertise" are protected by Illinois' work product rule); *Babcock v. Jackson*, 40 Misc. 2d 757, 760-62 (N.Y. Sup. Ct. 1963) (finding work product extends only to attorney and agents). Indeed, while one Illinois state court had extended work product to a testifying expert physician, by 1966, four years before the Federal Rules were adopted, the Illinois Supreme Court had explicitly overruled that interpretation. *Compare Kemeny v. Skorch*, 22 Ill. App. 2d 160, 169 (Ill. Ct. App. 1959) *with Monier*, 35 Ill. 2d at 358-59.

New York's formulation of the work product doctrine is similarly informative: In recognition that the general work product doctrine did not itself protect an expert's materials, the C.P.L.R. explicitly extended limited protection to experts—in a separate provision devoted to that specific subject. *See* New York C.P.L.R. 3101(d)(1) (protecting "any opinion of an expert prepared for litigation"); *Matter of Town of Hempstead*, 50 Misc. 2d 101, 103 (N.Y. Sup. Ct. 1966) (protecting certain critical documents underlying two testifying experts' opinions for, "[i]f the end result cannot be obtained, the component parts must be similarly protected"). But even that provision did not create a broad, general protection for all materials created "by or for" the expert.

As these pre-1970 amendment cases and rules show, the phrase "by or for a party or its representative" was a term of art in 1970, and it was limited to parties, their lawyers and agents. Although some jurisdictions also provided some protection for testifying experts' materials, that protection was afforded through *separate* provisions—in further recognition that the "for" portion of the "by or for" phrase in the existing rules was limited to materials prepared by agents of the lawyer or the client.

Having incorporated the "by or for" phrase into Rule 26(b)(3) in the 1970 amendments, *see 8 Wright & Miller* § 2023, p. 489-90, n. 16 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981)), Congress is presumed to have

40

incorporated into the Rules the same understanding—i.e., that to be protected work product under this provision, materials prepared "for" a party or an attorney must have been prepared by their agent. Chevron's arguments ignore this dispositive point.

> **2.  Draft Reports Aside, The Work Product Doctrine Does Not Protect Documents Created *By* Testifying Expert Witnesses Because They Are Not Agents Of An Attorney**

The text of Rule 26(b)(3)(A), and decisions construing it, confirm that it extends only to parties, their attorneys and agents. *See* Fed. R. Civ. P. 26(b)(3)(a) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."); *In re CPUC*, 892 F.2d 778, 781 (9th Cir. 1989); *United States v. Nobles*, 422 U.S. 225, 238-39 (1975) ("[T]he doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself"). The work product doctrine, moreover, "promotes the adversary system directly by protecting the confidentiality of papers prepared *by or on behalf of attorneys* in anticipation of litigation. Protecting *attorneys'* work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *In re Chevron Corp.* (U.B.R.), 633 F.3d 153, 165 (3d Cir. 2011) (citing *Westinghouse Elec. Corp. v. Republic of the*

*Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991)) (emphases added). Testifying experts fall into none of these categories and therefore their work is not generally protected as work product.

It is undisputed that Kelsh and Mackay are not attorneys. It is also undisputed that they are not consultants—their opinions were instead submitted to the *Lago Agrio* Court (and now to the arbitral tribunal) for their consideration in adjudicating a multi-billion dollar dispute.

Nor are they, in their role as testifying experts, "agents" of a party. That is because testifying experts have long been considered independent of the parties who retain them, not mere extensions of the parties or their counsel. Indeed, a testifying expert's "independence" is a hallmark of his unique role in our judicial system. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th. Cir. 1995) ("[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."); *see also* Fed. R. Evid. 702 Advisory Committee Note (2000) (listing "independence" as a factor in determining an expert's reliability).

Accordingly, as the Third Circuit stated in *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995), "[s]ince an expert witness is not subject to the

control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent." (citing Restatement (Second) of Agency § cmt. A (1958) ("The relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents to so act.").  And given that a testifying expert is not an agent of the party or its attorney, materials created by such an expert simply do not fall within Rule 26(b)(3)'s general protection for materials prepared "by or for" a party or its attorney.

Here, Chevron concedes that Kelsh and Mackay are reporting/testifying experts.  Br. at 17, 18.  As such, they are not parties, attorneys, consultants or agents; and the work product doctrine does not apply to them absent a specific provision elsewhere in the rules.  As the district courts held below, the only such provisions are in Rule 26(b)(4)(B) and (C)—and those provisions are not applicable to the documents at issue here because the Republic is not seeking either attorney-expert communications or (genuine) draft reports.[26]

---

[26]     It is equally clear that the Advisory Committee did not contemplate that the expert's own work product would be protected from disclosure (except with respect to draft reports):  "[T]his protection does not extend to the expert's own development of the opinions to be presented; those are subject to probing in deposition or at trial."  Rule 26 Advisory Committee Notes (2010) (discussing substantial need for attorney-expert communications).

### 3. Attorney Communications Aside, Any Work Product Protection Is Waived When Documents Are Disclosed To Testifying Expert Witnesses

Even assuming a document at one time enjoyed protection from compelled production, its subsequent use or disclosure may render the previously-protected document subject to discovery. That is true of any materials (other than attorney communications) provided to testifying experts: Once an expert is designated as a testifying expert—like Kelsh and Mackay were for the *Lago Agrio* litigation—any protections for documents considered by the expert are waived. Because they will be deposed and will testify under Rule 26(b)(4)(A), and the very purpose of disclosure to a testifying expert is to inform an expert's opinion and testimony before a court, disclosure to or communications with testifying experts in connection with the development of their opinions have long been deemed a waiver of any applicable privilege. *In re Pioneer Hi-Bred Intern. Inc*., 238 F.3d 1370, 1375-76 (Fed. Cir. 2001) ("because any disclosure to a testifying expert in connection with his testimony assumes that privileged or protected material will be made public, [*United States v.*] *Cote*, 456 F.2d [142,] 144-45 & n. 3 [(8th Cir. 1972)], there is a waiver to the same extent as with any other disclosure"); *In re Chevron Corp.* (*U.B.R.*), 633 F.3d 153, 165 (3d Cir. 2011) ("We agree with the District Court that . . . '[b]y providing consulting expert reports to a testifying expert, the privilege is lost'"). *Id*. at 164, n. 3; *see Bd. of Trs. of Leland Stanford*

*Junior Univ. v. Roche Molecular,* 237 F.R.D. 618, 623-4, n. 3 (N.D. Cal. 2006) ("in cases where the voluntary disclosure of attorney work product to an adversary or third party substantially increases the possibility of an opposing party obtaining the information, this would defeat the policy underlying the privilege") (internal quotations and citations omitted).

As the Third Circuit has observed, where "material is disclosed in a manner inconsistent with keeping it from an adversary [then] the work product doctrine is waived." *In re Chevron Corp.* (U.B.R.), 633 F.3d at 165; *accord. Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) ("Although work product immunity is not automatically waived by disclosure of protected material to third parties, disclosure does waive protection if it 'has substantially increased the opportunities for potential adversaries to obtain the information.'"). That is true of the materials here. Aside from attorney-expert communications, any disclosure of work product to a testifying/reporting expert constitutes a waiver of any protection that would otherwise apply.

    **4.    Contrary To Chevron's Argument, The Change In Rule 26(a) To Require Disclosure Of "Facts And Data" Simply Made That Provision, Which Deals With Initial Disclosures, Consistent With The Scope Of Third-Party Discovery Under Rule 26(b)**

The breadth of testifying expert discovery available under Rule 26(b) is confirmed by the disclosure provisions of Rule 26(a). A testifying expert's duty to

disclose encompasses all documents—and all "facts and data"—considered in forming his opinion except those explicitly protected by Rule 26(b)(4)(B) and (C). Black's Law Dictionary defines a "fact" as "something that actually exists; an aspect of reality . . .  Facts include not just tangible things, actual occurrences, and relationships, but also states of mind such as intentions and opinions."  Black's Law Dictionary 628 (8th ed. 2007).

Contrary to Chevron's contention, Br. at 29, and as both district courts found, the documents at issue here fall squarely within "facts and data."  One of the principal categories of documents ordered produced by the courts below—communications between Kelsh and Mackay and other non-attorneys—are nothing if not facts:  Those communications could only have been communicating "something that actually exists" which necessarily includes the non-attorneys'"states of mind."

Expert discovery under Rule 26 must also be construed in light of the Federal Rules of Evidence, which establish the procedure within which experts may offer their opinion at trial. *See Wright & Miller* § 2029, p. 23 ("The need for substantial discovery regarding experts who will testify at trial became more evident after the adoption of the Federal rules of Evidence in 1975").  In the context of the Federal Rules of Evidence, the Fourth Circuit has interpreted "facts or data" to include even "inadmissible evidence—including hearsay."  *See United*

*States v. Palacios*, 677 F.3d 234, (4th Cir. 2012). Similarly, numerous district courts—the very triers of fact whom experts are intended to assist—have interpreted "facts or data" to include opinions considered by an expert. *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 600 (N.D. Cal. 2008) ("'Facts or data' may include other experts' reliable opinions or hypothetical facts that are supported by the evidence."); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 310 (D. Vt. 2007) ("'facts or data' may include reliable opinions of other experts and hypothetical facts that are supported by the evidence.") Since an expert can consider another experts' opinions as "facts or data" when testifying at trial, Rule 26(A)(2)(B) must be interpreted just as broadly to require disclosure of all expert opinions considered by a testifying expert, even if such information is ultimately rejected. *See Fialkowski v. Perry*, No. 11-5139, 2012 WL 2527020 (E.D. Pa. June 29, 2012).

The Advisory Committee notes are clear; "[t]he intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." Rule 26 Advisory Committee Notes (2010) (emphasis added). And once again, that mandate squarely contradicts Chevron's view that any materials prepared "by or for" a testifying expert in litigation are necessarily protected under the general work product rule articulated in Rule 26(b)(3).

**C.    The Decisions Below Properly Applied These Principles In Rejecting Chevron's Work Product Claims As To All Three Categories Of Documents As To Which The Republic's Motions Were Granted**

The decisions below properly applied these principles in rejecting work product protection for each category of documents as to which Chevron claims protection here.  Indeed, each of the courts below came to the same conclusion, albeit in different levels of detail.  Moreover, contrary to Chevron's assertion, Br. at 19, both courts held that the 2010 amendments applied, and neither court applied the pre-2010 "bright line rule."

As previously noted, the documents and other materials that remain at issue in this case fall into three specific categories.  And as we now show for each category, the district courts correctly applied the pertinent principles in rejecting Chevron's work product claims.

**1.    Communications Between Non-Attorney Chevron Employees And Testifying Experts Or Their Assistants**

The first category consists of communications between non-attorney Chevron employees and testifying experts or their assistants.  *See* ER 23.  In compelling production of those communications, which the *Kelsh* district court reviewed *in camera*, the district court applied section 26(b)(4) as written, observing:  "If the rules committee intended to protect from disclosure all expert information prepared in anticipation of litigation, it would not have refashioned

section 26(b)(4) specifically to address expert discovery." *Id.* at 13 (citations to recent district court cases applying Rule 26(b)(4) as opposed to Rule 26(b)(3)(A) omitted). In doing so, the court cited the Advisory Committee Notes discussed above limiting work product protection to communications with the attorney for the party. *Id.*

For reasons discussed above, Chevron's only argument as to this category of documents—that any materials in the files of a testifying expert created "by or for" a party or attorney in anticipation of litigation are protected—is erroneous. And Chevron has offered no other basis for challenging the district courts' conclusions as to this category of documents.

### 2. Communications Involving Non-Attorneys Claimed To Be "Agents" Of Chevron

The next category of documents consists of communications with non-attorneys claimed to be "agents" of Chevron." In confronting Chevron's claims that certain third party consultants were Chevron's agents, the court below observed that Rule 26(b)(4)(C) extends specifically to reporting experts, and that the Advisory Committee Notes "foreclose the notion that consulting experts are afforded protection as 'agents' of a party or that party's attorney." ER 25-26. And indeed the Advisory Committee Notes state that the work product rule "does not

itself protect communications between counsel and other expert witnesses, such as those for whom disclosure is required under Rule 26(a)(2)(C)."

Under this rule, the court below held that communications between Chevron's attorneys and consulting experts, between Kelsh and consulting experts, and between or among the consulting experts "cannot be cloaked" with protection on the ground that they involved Chevron's "agents," and therefore were not protected by the work product doctrine of Rule 26(b)(3). This conclusion too was clearly not an abuse of discretion: For reasons explained above, documents not involving Chevron's attorneys (or Chevron itself) never enjoyed work product protection at all. Any protection that might have existed for documents involving interactions between Chevron's attorneys and others—such as consulting experts—was waived once those documents were provided to the testifying/reporting experts.

### 3.     Communications Solely Among Testifying Experts

With respect to communications between Kelsh and other experts who provided reports in the *Lago Agrio* litigation, the court correctly pointed out that the amendments to Rule 26 had not changed the existing rule in *Penn Nat'l Ins. Co. v. HNI Corp.*, 245 F.R.D. 190, 194 (M.D. Pa. 2007), specifically adding that "Respondents cannot withhold communications between their testifying experts under a rule that protects only attorney-expert communications." ER 26. The

court also cited the Advisory Committee comment that "inquiry about communications the expert had with anyone other than the party's counsel about the opinions expressed is unaffected by the rule." ER 27.

Here again, Chevron's only challenge to this conclusion is its sweeping argument that anything in a testifying expert's file that was prepared in some sense "by or for" an attorney or a party is protected from disclosure. Given that a testifying expert is not an agent of the party or attorney, materials prepared by such an expert are not generally protected by Rule 26(b)(3). And for the same reason, any work product protection that otherwise might apply to particular documents (other than attorney communications) is lost once those documents are supplied to a testifying expert. Accordingly, as to this category of documents as well, Chevron has established no abuse of discretion.

\* \* \*

The pro-discovery policy reflected in Rule 26(b)(1) and elsewhere strongly supports the district courts' conclusions that the documents at issue here are discoverable. As the District Court noted, the "work product doctrine is to be narrowly construed as its application can derogate from the search for the truth." ER 24. And as courts have found over the last several decades, experts are often the most critical witnesses in the courtroom, and broad expert disclosure is therefore vital to permit the opposing party and judge to assess an expert's

51

credibility and reliability. *United States v. Meyer*, 398 F.2d 66, 75 (9th Cir. 1968);

*TV-3 v. Royal Ins. Co. of Am.*, 194 F.R.D. 585, 588 (S.D. Miss. 2000).

## II.    If Necessary, The District Court's Decisions Can And Should Be Affirmed On Alternative Grounds

The decisions of the courts below should be affirmed on two alternative grounds.  First, Chevron is judicially estopped from arguing that testimonial and documentary privileges extend to Kelsh and Mackay having argued the opposite for tactical gain when it sought discovery of its opponents' testifying experts.  Second, the Republic has a substantial need for the discovery it seeks from Kelsh and Mackay, as there is no other mechanism to examine the propriety of the experts' conclusions at issue in the Treaty Arbitration.

### A.    Chevron's Position In This Case Is Flatly Contrary To Its Position In Other Cases, And Is Therefore Barred By Judicial Estoppel

Chevron repeatedly and successfully argued in its own Section 1782 applications a position diametrically opposite to the one it espouses here:  That testimonial and documentary privileges do *not* extend to testifying expert witnesses.  Having sought and obtained Section 1782 discovery from the *Lago Agrio* Plaintiffs' environmental experts on these grounds, Chevron is judicially estopped from arguing that testimonial and documentary privileges extend to Kelsh and Mackay.

Chevron's conduct here is the sort of conduct that the judicial estoppel doctrine condemns. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations and citations omitted). The doctrine therefore "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Risetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 497, 600 (9th Cir. 1996). As this Court previously observed, the doctrine "applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion." *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997). And the doctrine applies where there are (i) inconsistent positions; (ii) used to gain an unfair advantage; and (iii) where the change in position was not inadvertent. *See Wagner v. Professional Engineers in California Gov't*, 354 F.3d 1036, 1050 (9th Cir. 2004) (enforcing the doctrine where an inconsistent position was taken "to gain an advantage in the litigation"); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215 (9th Cir. 1984) (requiring an unfair advantage). Each of these requirements is easily satisfied here.

*First*, it is undisputed that Chevron argued in support of many of its own Section 1782 applications a position inconsistent to the one it advances here. For example, to obtain 1782 discovery from an environmental expert, Barnthouse,

Chevron argued:  "Because he is a testifying expert, he is subject to full discovery and is not shielded by any conceivable 'privilege' . . . . [C]ommunications between Plaintiffs' counsel and Respondent are not subject to any privilege.'"  SER 767, 782, Memorandum in Support, *In re Chevron Corp.* (Barnthouse), No. 10-MC-00053 (S.D. Ohio Oct. 22, 2010); *see also* SER 807-808, Memorandum in Support, *In re Chevron Corp.* (Scardina), No. 10-mc-00067 (W.D. Va. Nov. 5, 2010) ("That rule extends even to materials simply 'considered' by testifying experts."); SER 834-835, Memorandum in Support, *In re Chevron Corp.* (Picone), No. 10-cv-02990 (D. Md. Oct. 22, 2010) (same); SER 859, Memorandum in Support, *In re Chevron Corp.* (Shefftz), No. 10-mc-10352 (D. Mass. Oct. 22, 2010) (same); SER 881-882, Memorandum in Support of Application, *In re Chevron Corp.* (Allen), No. 10-mc-00091 (D. Vt. Oct. 22, 2010) (same); *cf.* Memorandum in Support of Motion to Compel, *In re Chevron Corp.* (Allen), No. 10-mc-00091 (D. Vt. Dec. 10, 2010) (arguing that Section 1782 discovery is not privileged or protected work product where the discovery is sought from a non-reporting expert who substantially collaborated with reporting experts).[27]  Each and every court to which Chevron made this argument accepted Chevron's unqualified position and agreed

---

[27]   Chevron may be judicially estopped even though their inconsistent positions were advanced in other fora.  *E.g.*, *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997) (enforcing the doctrine to prior inconsistent statements first made in a Hawaii state court and later in the United States federal courts).

that the Section 1782 discovery sought by Chevron was not privileged or protected. *E.g.*, SER 757-759.

*Second*, Chevron's inconsistent position is unquestionably for tactical gain. Chevron has adopted its contradictory position in this proceeding precisely because it seeks to deprive the Republic of equivalent discovery that the Republic can use in its own preparation for the Treaty Arbitration. In doing so, Chevron seeks an unfair advantage over the Republic. Having already obtained unprecedented discovery under Section 1782 from many of the environmental experts who opposed its own experts, Chevron now contends that the same Rule that afforded it that broad discovery may *not* be employed by the Republic to obtain comparable discovery for the identical Treaty Arbitration.

Chevron did not advance this legal proposition inadvertently. As shown above, in each of its Section 1782 applications to obtain discovery from the *Lago Agrio* Plaintiffs' environmental experts, Chevron affirmatively argued that the discovery sought was not privileged or protected work. Indeed, when the shoe was on the other foot, Chevron characterized the *Lago Agrio* plaintiffs' interpretation of Rule 26—which Chevron now adopts here—as "baseless," an "interrupt[ion] [of] the discovery process," and a delay technique designed to "frustrate Chevron's

efforts to obtain legitimate discovery to which it is entitled."[28]  In this proceeding, Chevron affirmatively, and deliberately, adopted a contrary view aimed at limiting disclosure of documents and communications on which its experts relied.

The court below was incorrect in finding that application of judicial estoppel is inappropriate here where Chevron's prior position was taken before Rule 26 was amended in 2010.  *Cf.* ER 19 (quoting *In re Application of Ecuador* (Hinchee), No. 11-mc-73 RH (WCS), at *6-7 (N.D. Fla. Dec. 8. 2011)) ("[C]ontrary to the estoppel arguments made by the Republic about Chevron's prior discovery conduct, 'there is nothing improper about obtaining a ruling under the rules as they exist at the time and later, after the rules are amended, asserting that the amendments govern further proceedings.").  The court below was mistaken (and abused its discretion) in so finding, because Chevron's prior inconsistent statements sought to compel discovery in light of the *amended* rule.  *E.g.*, SER 758.  Chevron is not relying on the Rule 26 change to excuse itself from the judicial estoppel doctrine—in fact there is no excuse for Chevron's abrupt change in position here.

Chevron's attempt to piggy back on the amendment to Rule 26 to excuse its inconsistent position constitutes the type of gamesmanship the judicial estoppel

---

[28]  SER 891, Memorandum in Support of Motion to Compel, *In re Chevron Corp.* (Shefftz), No. 10-mc-10352 (D. Mass. Dec. 13, 2010).

doctrine condemns.  As this Court has put it, the doctrine "prevent[s] parties from playing fast and loose with the courts," *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997) (citations omitted), which is exactly what Chevron is doing here.

Finally, though Kelsh and Mackay were not parties to Chevron's numerous prior Section 1782 Applications, they are judicially estopped as Chevron's privies. *See Maitland v. Univ. of Minn.*, 43 F.3d 357, 364 (8th Cir. 1994) (noting estoppel doctrines extend to a party's privy); *Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, No. 05 Civ. 3939 (CM), 2008 WL 4127830, at *9 (S.D.N.Y. Sept. 2, 2008) (A party may be "judicially estopped to assert a position because of a prior inconsistent position taken by the party's privy."); *see also Capsopoulos ex rel. Capsopoulos v. Chater*, No. 95 C 3274, 1996 WL 717456, at *2 (N.D. Ill. Dec. 9, 1996) ("Although judicial estoppel has generally been applied only where the identical party has taken the contradictory positions, a party in privity with the original party may also be estopped under judicial estoppel.").  Here, Kelsh and Mackay are plainly Chevron's privies in light of their partnership in the *Lago Agrio* case and their common interest in the Section 1782 Application.  *See Ruiz v. Comm'r of Dept. of Transp. of City of New York*, 858 F.2d 898, 903 (2d Cir. 1988) (finding privity where parties have a mutual interest in outcome of litigation). Their sharing of counsel serves as further proof of their privity.  *See id.*

(representation by same attorneys is of "singular significance" in favor of finding privity).

**B.    In Any Event, The Republic Has Made A Showing Of "Substantial Need" And Hardship Sufficient To Overcome Any Work product Protection That Might Exist Here**

Even if Chevron could assert "work product" protection for certain discrete documents under Rule 26, the Republic would nonetheless be entitled to disclosure if it can "demonstrat[e] . . . substantial need or inability to obtain the equivalent without undue hardship." *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3)(ii). It has done so.

Specifically, the Republic has a "substantial need" for the documents at issue here because, absent disclosure, no mechanism exists for the Republic to examine and assess the propriety of Kelsh and Mackay's drafting processes or otherwise determine whether they included in each of their reports only favorable data and facts while deliberately ignoring inculpatory facts or data. This is especially appropriate here, because in seeking to deny the Republic access to Kelsh and Mackay's materials, Chevron appears to be hiding evidence of both (i) current oilfield pollution *and* (ii) its deliberate, and possibly deceptive, practice of selectively choosing the data on which its experts have relied.

Evidence now establishes that Chevron engaged in extensive, unilateral "Pre-Inspections" at the future Judicial Inspection sites listed by the *Lago Agrio*

Court.  By engaging in such improper pre-inspections, Chevron and its experts knew exactly where the polluted locations were, and where they were not.  They then "cherry-picked" specific "cleaner" site locations for further supposedly "representative" testing.  As a consequence, Chevron's experts' Judicial Inspection sampling data—the data on which Kelsh's and Mackay's reports were allegedly based—appears to not be random at all.  In this way, Chevron apparently guaranteed itself the expert conclusions it sought.

The pre-inspections issue is particularly poignant here because Mackay was retained in part to opine on the validity of Chevron's own sampling methodology.  In his expert report, Mackay stated that Chevron's methodology produced results representative of the environmental conditions present.  But as shown by Chevron's own "Judicial Inspection Playbook"—the instructions given to its experts at each Judicial Inspection—Chevron's sampling locations were selected based on where clean results had been obtained during pre-inspections.  The experts were given a detailed narrative plus a map of each station indicating where pre-inspection sampling occurred and what the results were of those samples.

To the extent that any discrete set of documents might rightfully be deemed protected, the Republic thus has a substantial need for such documents to confirm whether Chevron's experts' conclusions are the product of selective sampling, thus

calling into question their reliability and validity.  Exploration of such issues  is the very purpose of expert discovery.  *Meyer*, 398 F.2d at 75.

## CONCLUSION

Chevron's effort to cloak these documents under a "work product" blanket is counter to the plain language, Advisory Committee notes, and purpose of Rule 26, leaving the Republic unable to evaluate the validity and reliability of Kelsh's and Mackay's expert opinions that Chevron submitted to the arbitral tribunal.  For these reasons, the decisions below should be affirmed.

Dated:  August 24, 2012                    Respectfully Submitted,

                                           */s/ Gene C. Schaerr*
Richard A. Lapping                         Gene C. Schaerr
WINSTON & STRAWN LLP                       Eric W. Bloom
101 California Street                      WINSTON & STRAWN LLP
San Francisco, CA 94111                    1700 K Street, N.W.
Phone:  (415) 591-1000                     Washington, DC 20006
Fax:      (415) 591-1400                   Phone:  (202) 282-5000
E-mail:  rlapping@winston.com              Fax:      (202) 282-5100
                                           E-mail:  GSchaerr@winston.com
                                           E-mail:  EBloom@winston.com

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

The Republic of Ecuador does not know of any other matter pending before this Court that arises out of these consolidated cases, concerns these same cases, involves the same transaction or event, or raises the same or closely related issues.

# <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(7)(B)(iii), the typeface requirements of Fed. R. App. P. 32(a)(5)(A), and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief, prepared in 14-point Times New Roman font, contains 13,973 words, exclusive of the words exempted from the word count limitation by Fed. R. App. P. 32(a)(7)(B)(iii), according to the word-count feature of the Microsoft Windows XP Professional ® program used to prepare the brief.


*/s/ Gene C. Schaerr*
Gene C. Schaerr
Counsel for Plaintiffs-Appellees

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that on August 24, 2012, I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by

using the appellate CM/ECF system.

I also certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.


*/s/ Gene C. Schaerr*
Gene C. Schaerr
Counsel for Plaintiffs-Appellees